**BLEICHMAR FONTI & AULD LLP**
Peter E. Borkon (Bar No. 212596)
pborkon@bfalaw.com
555 12th Street, Suite 1600
Oakland, CA 94607
Telephone: (415) 445-4003
Facsimile: (415) 445-4020

*Counsel for Plaintiff Southeastern Pennsylvania*
*Transportation Authority*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| | CLASS ACTION |
| Plaintiff, | |
| | COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| v. | |
| | JURY TRIAL DEMANDED |
| CHEMOCENTRYX, INC. and THOMAS J. SCHALL, | ECF CASE |
| Defendants. | |

Plaintiff Southeastern Pennsylvania Transportation Authority ("SEPTA" or "Plaintiff"), by and through its counsel, Bleichmar Fonti & Auld LLP, alleges the following upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters. Plaintiff's information and belief are based on, among other things, the independent investigation of Counsel. This investigation includes, but is not limited to, a review and analysis of: (i) public filings by ChemoCentryx, Inc. ("ChemoCentryx" or the "Company") with the Securities and Exchange Commission ("SEC"); (ii) transcripts of ChemoCentryx conferences with investors and analysts; (iii) press releases and media reports issued by and disseminated by the Company;

(iv) analyst reports concerning ChemoCentryx; and (v) other public information and data regarding the Company.

### NATURE OF THE ACTION AND OVERVIEW

1.     This is a class action on behalf of all persons and entities that purchased or acquired ChemoCentryx common stock between November 26, 2019 and May 6, 2021 inclusive (the "Class Period"), against (i) ChemoCentryx and (ii) the Company's Chief Executive Officer ("CEO") Thomas J. Schall ("Schall"), and were damaged by Defendants' violations of the Securities Exchange Act of 1934 (the "Exchange Act").

2.     ChemoCentryx is a San Carlos, California based biopharmaceutical company focused on the development and commercialization of new medications targeting inflammatory disorders, autoimmune diseases, and cancer.  ChemoCentryx's lead drug candidate is named avacopan.  According to the Company, avacopan is "a first-in-class, orally-administered small molecule that employs a novel, highly targeted mode of action in the treatment of ANCA-associated vasculitis."  ChemoCentryx common stock trades on the NASDAQ stock exchange under the ticker symbol "CCXI."

3.     On November 25, 2019, after the markets closed, ChemoCentryx published a press release titled, "Positive Topline Data from Pivotal Phase III ADVOCATE Trial Demonstrating Avacopan's Superiority Over Standard of Care in ANCA-Associated Vasculitis." The press release stated that the ADVOCATE trial "met both of its primary endpoints" and "[t]he topline safety results revealed an acceptable safety profile in this serious and life-threatening disease."

4.     Defendant Schall, the Company's President, CEO, and Chairman of the Board of Directors, added "[t]hese results exceed our expectations.  Today we mark the dawn of a new and historic period in the lives of ANCA vasculitis patients.  This day we have for the first time demonstrated that a highly targeted therapy aimed at the very center of the ANCA disease process is superior to the traditional approach of broad immune suppression therapy; a therapy which the present findings may make obsolete.  Until now ANCA vasculitis patients have had to endure

regimens that contain chronic high doses of steroids and all their noxious effects, but with today's data it is clear that the time of making patients sick with steroid therapy in an attempt to make their acute vasculitis better may at last be over."

5.     On this news, the price of ChemoCentryx's common stock soared, quadrupling from $8.06 per share at the close of trading on November 25, 2019, to $34.82 per share at the opening of trading on November 26, 2019, before closing at $30.73 for the day.

6.     Over the next year and a half, Defendants continued to tout the results of the ADVOCATE trial and the safety profile of avacopan for the treatment of ANCA-associated vasculitis.

7.     On July 9, 2020, ChemoCentryx announced that it had filed its New Drug Application ("NDA") for avacopan, and on September 17, 2020, the Company announced that the Food and Drug Administration ("FDA") had accepted the NDA for review.

8.     On March 26, 2021, the FDA announced that it would convene an Advisory Committee meeting on May 6, 2021 to discuss the NDA for avacopan.  The FDA often convenes Advisory Committee meetings of independent experts to help inform the FDA's ultimate decision as to whether it will approve a particular drug.

9.     On May 4, 2021, the FDA published a Briefing Document that it created for the Advisory Committee concerning the avacopan NDA and the ADVOCATE trial results.  The Briefing Document requested the Advisory Committee's "input on the efficacy results, including their clinical meaningfulness, and the benefit-risk assessment of avacopan for the proposed indication."  In the Briefing Document, the FDA wrote that "*[c]omplexities of the study design, as detailed in the briefing document, raise questions about the interpretability of the data to define a clinically meaningful benefit of avacopan and its role in the management of AAV.*"[1] The FDA further stated that "[a]lthough primary efficacy comparisons were statistically significant, the review team has identified several areas of concern, raising uncertainties about

---

[1] All emphasis added.

Class Action Complaint for Violation of the Federal Securities Laws

the interpretability of these data and the clinical meaningfulness of these results." The FDA also raised serious safety concerns with avacopan.

10.     On this news, the price of ChemoCentryx common stock fell more than 45%, from $48.82 per share on May 3, 2021 to $26.63 per share on May 4, 2021, on unusually high trading volume.

11.     On May 6, 2021, after the close of trading, ChemoCentryx issued a press release concerning the results of the FDA's Advisory Committee meeting. Significantly, the Advisory Committee was evenly divided as to whether the efficacy data from ADVOCATE supported approval of avacopan. News outlets and analysts immediately reported on and discussed the fallout from the Advisory Committee meeting. For example, on May 6, 2021, *Endpoints News*, a prominent biotech and pharmaceutical news organization, reported that members of the Advisory Committee "raised concerns about relying on the single trial as evidence, the insufficient amount of safety data, and questions on whether the trial was statistically robust enough." Similarly, J.P. Morgan analysts wrote in a May 7, 2021 report that, "while the vote was more 50 / 50-ish, we note that commentary by the panel was skewed to more of a negative tone (with even the need for an additional trial cited multiple times by a number of panelists to better understand / come to a conclusion on the benefit / risk profile of avacopan)."

12.     On this news, the price of ChemoCentryx common stock fell approximately 62%, from $27.49 per share on May 6, 2021 to $10.46 per share on May 7, 2021, on unusually high trading volume.

13.     Throughout the Class Period, Defendants made materially false and/or misleading statements and/or failed to disclose that: (1) ChemoCentryx's design for the ADVOCATE Phase III trial was fundamentally flawed, which raised questions about the interpretability of the trial data and the ability to define a clinically meaningful benefit of avacopan and its role in the treatment of ANCA-associated vasculitis; (2) the results from the ADVOCATE trial raised serious safety concerns for avacopan; and (3) these issues raised significant doubt about the viability of ChemoCentryx's NDA for avacopan for the treatment of ANCA-associated

Class Action Complaint for Violation of the Federal Securities Laws

vasculitis.  As a result, Defendants' statements about the ADVOCATE trial design, efficacy, and safety results were materially false and misleading at all relevant times.

14.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of ChemoCentryx's common stock, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

15.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

17.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because ChemoCentryx's headquarters are located within this District and Defendants conducted substantial economic activity in the District.  As such, substantial acts in furtherance of the alleged fraud have occurred in this District.

18.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

19.     Plaintiff is an institutional investor based in Philadelphia, Pennsylvania that manages more than $1.4 billion in assets on behalf of approximately 14,000 beneficiaries. Plaintiff purchased ChemoCentryx common stock during the Class Period, as detailed in the Certification attached hereto and incorporated herein, and has been damaged thereby.

Class Action Complaint for Violation of the Federal Securities Laws

20.     Defendant ChemoCentryx is a Delaware corporation with its corporate headquarters and principal place of business in San Carlos, California.   ChemoCentryx's common stock trades on the NASDAQ stock exchange under the ticker symbol "CCXI."

21.     Defendant Schall founded ChemoCentryx in 1997 and has served as President and CEO since that time.  Schall was appointed Chairman of the Board after the company went public in 2012.

22.     Defendant Schall, because of his positions at ChemoCentryx, possessed the power and authority to control the contents of ChemoCentryx's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.

23.     Defendant Schall was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of his positions and access to material non-public information available to him, Defendant Schall knew that the adverse facts and omissions specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations and omissions which were being made were then materially false and/or misleading.

## SUBSTANTIVE ALLEGATIONS

### Background

24.     ChemoCentryx describes itself as a biopharmaceutical company focused on the development and commercialization of new medications targeting inflammatory disorders, autoimmune diseases, and cancer.  The Company's lead drug candidate is named avacopan, a treatment for patients with ANCA-associated vasculitis.

25.     ANCA-associated vasculitis is a severe and often fatal autoimmune disease in which immune cells become overactive and attack blood vessels in the body, causing inflammation and damage that can impact many different organ systems, most commonly the kidneys.  ANCA-associated vasculitis can present a range of severity and symptoms, ranging from skin rashes, to kidney disease, to life threatening pulmonary hemorrhage.

26.     There is no cure for ANCA-associated vasculitis.   Instead, patients receive treatments to manage the condition.   Initial treatment includes high doses of the steroid prednisone combined with immunosuppressive drugs to control inflammation and reach remission.   Relapse is common, and each relapse can cause irreversible organ damage and often requires long term prednisone treatment.   If a patient does achieve remission, maintenance therapy follows, which includes regimens of additional steroids and immunosuppressants.

27.     Prednisone treatment comes with serious side effects, including compromised immune systems, and can lead to diabetes, hypertension, psychiatric disorders, cataracts, osteoporosis, and significant weight gain.   Ongoing prednisone treatment is also a major cause of death in ANCA-associated vasculitis patients.   According to ChemoCentryx, first year mortality is 11% to 18%, with the greatest cause of death being infection or other side effects from prednisone treatment.

28.     ChemoCentryx intends for avacopan to replace prednisone as the standard of care for ANCA-associated vasculitis.

**Materially False and Misleading Statements Issued During the Class Period**

29.     The Class Period begins on November 26, 2019.   Shortly after the markets closed on November 25, 2019, ChemoCentryx published a press release titled "Positive Topline Data from Pivotal Phase III ADVOCATE Trial Demonstrating Avacopan's Superiority Over Standard of Care in ANCA-Associated Vasculitis."   The press release further stated:

> This global study, in which a total of 331 patients with acute ANCA vasculitis were enrolled, met both of its primary endpoints, disease remission at 26 weeks and sustained remission at 52 weeks, as assessed by the Birmingham Vasculitis Activity Score, or BVAS. Remission was defined as a BVAS score of zero and being off glucocorticoid [prednisone] treatment for ANCA vasculitis for at least the preceding four weeks. The pre-specified primary endpoints were remission of acute vasculitis activity at week 26 and sustained remission at week 52, where avacopan therapy was at least statistically non-inferior to the currently used glucocorticoid-containing standard of care (glucocorticoid SOC).
>
> * * *
>
> The topline safety results revealed an acceptable safety profile in this serious and life-threatening disease, with fewer subjects having serious adverse events (SAEs)

Class Action Complaint for Violation of the Federal Securities Laws

in the avacopan group than in the glucocorticoid SOC control group (42% vs. 45%, respectively). Most reported SAEs were related to underlying ANCA vasculitis disease and commensurate with rates in previously published ANCA vasculitis trials. There were fewer subjects with serious infections in the avacopan group than the glucocorticoid SOC control group.

30.     The November 25, 2019 press release also quoted Defendant Schall:

These results exceed our expectations. Today we mark the dawn of a new and historic period in the lives of ANCA vasculitis patients. This day we have for the first time demonstrated that a highly targeted therapy aimed at the very center of the ANCA disease process is superior to the traditional approach of broad immune suppression therapy; a therapy which the present findings may make obsolete. Until now ANCA vasculitis patients have had to endure regimens that contain chronic high doses of steroids and all their noxious effects, but with today's data it is clear that the time of making patients sick with steroid therapy in an attempt to make their acute vasculitis better may at last be over.

31.     In the November 25, 2019 press release, ChemoCentryx also stated that the data showed "[s]ignificant reduction in glucocorticoid-related toxicity," "significant improvement in kidney function in patients with renal disease," and "improvements in health-related quality of life metrics."

32.     Also on November 25, 2019, ChemoCentryx held a call with investment analysts to discuss the results of the ADVOCATE Phase III trial.  During the call, Defendant Schall stated, "I believe today, we marked the dawn of a new historic period in the lives of ANCA vasculitis patients.  We have, for the first time, demonstrated that a highly targeted therapy aimed at the very center of the ANCA disease process is superior to the traditional approach of broad immunosuppression therapy, which utilizes historically chronic high doses of steroids and accompanies – and has accompanying with that, all their noxious effects."

33.     On the November 25, 2019 call, Defendant Schall further stated:

Let me summarize the results of this landmark study known as the ADVOCATE trial. The evidence we have obtained, and as we will discuss, seems quite clear. We believe it demonstrates superiority of avacopan to the current standard of care in this serious and life-threatening disease. We will show that avacopan successfully achieved its 2 primary endpoints as measured by BVAS, B-V-A-S, or the Birmingham Vasculitis Activity Score, and also exhibited strong evidence for reducing the total burden of disease in ANCA vasculitis as exemplified by avacopan therapies decreased rates of glucocorticoid toxicities relative to the standard of care. Also, avacopan's ability to improve renal function parameters.

-8-

And we'll show also how avacopan therapy leads to improvement in health-related quality of life measurements, using validated instruments and patient-reported outcomes.

In terms of trial design, I will remind you that the ADVOCATE trial involved a predefined hierarchical analysis of primary endpoints, a so-called gatekeeper procedure in order to preserve Type 1 error. And I think as you can see on this slide, on the left-hand side, in the first primary endpoint, the prespecified statistical null hypothesis was one of non-inferiority for patients in remission from acute vasculitis symptoms as measured by the BVAS.

That is, avacopan therapy would be at least no worse on a statistical level for BVAS remission and note, we are only talking about BVAS in the primary endpoint, not overall patient wellness. As I have talked at length with many of you in the community as to why the null hypothesis was non-inferiority and was the only one available to use in this orphan indication and primarily due to limitations and/or patient sample size as we are confronted with in an orphan indication such ANCA vasculitis. So it was necessary to use the non-inferiority null hypothesis because of limitations and the ability to power the trial for anything but. I will also remind us that while we've discussed this before that this is the standard that's been used in previous Phase III ANCA trials as the null hypothesis.

34.     Also during the November 25, 2019 call, Defendant Schall stated, "So in summary, as I said before we go over to questions, we've met our primary endpoints.  We've shown evidence of glucocorticoid-related toxicity reductions with avacopan.  We seem to be improving quality of life, and there's evidence even for renal improvement.  And I will say – I'll mention as well, safety seems to be very acceptable.  The drug was generally very well tolerated with lower incidences of [adverse events] in the ANCA patient population."

35.     Schall also discussed FDA approval of avacopan in light of the ADVOCATE trial results on the November 25, 2019 call.  Specifically, he stated, "Obviously, we have a potential path to regulatory approval, as I just laid out with some of the qualities that I've shown you from the ADVOCATE data set."

36.     On November 26, 2019, ChemoCentryx issued a press release announcing that Defendant Schall would speak at a December 4, 2019 Piper Jaffray Healthcare Conference.  The press release further stated, "[i]n the pivotal Phase III ADVOCATE trial, avacopan demonstrated the ability to induce vasculitis remission at 26 weeks and demonstrated statistically significant

Class Action Complaint for Violation of the Federal Securities Laws

superiority over standard of care (SOC) in sustaining vasculitis remission at 52 weeks.  The topline safety results revealed an acceptable safety profile in this serious and life-threatening disease with fewer subjects having serious adverse events in the avacopan group than in the glucocorticoid-containing SOC."

37.     On January 8, 2020, ChemoCentryx issued a press release announcing that Defendant Schall would speak at a January 15, 2020 JPMorgan Healthcare Conference.  The press release also contained the same language quoted *supra* in ¶ 36.

38.     On January 15, 2020, ChemoCentryx participated in the JPMorgan Healthcare Conference.   During the conference, Defendant Schall touted the ADVOCATE trial results. Specifically, he stated, "we really did sweep the board here in all of the total spectrum, the total burden of disease.  I think we've shown good evidence for clinical benefit.  And that takes us to a new place, both with regulators and thinking about the utility of this molecule.  Now, of course, we have to file the NDA.  Of course, we have to get the label.  But I think that it really does enhance the prospects for the value proposition for this particular drug in a very compelling way. And most important creates a new area of opportunity and hope for patients.  As one said, this is the drug we have been waiting for for decades."

39.     On February 19, 2020, ChemoCentryx issued a press release announcing that Defendant Schall would speak at the 9th Annual SVB Leerink Healthcare Conference on February 26, 2020.  The press release contained substantially similar language to the language quoted *supra* in ¶ 36.

40.     On March 3, 2020, the Company issued a press release announcing that it would release its Fourth Quarter and Full Year 2019 Financial Results on March 10, 2020.  The press release contained substantially similar language to the language quoted *supra* in ¶ 36.

41.     On March 10, 2020, ChemoCentryx issued a press release announcing its Fourth Quarter and Full Year 2019 Financial Results.  The press release quoted Defendant Schall:

> The power of data to transform the world was evident in the results of our Phase III
> ADVOCATE trial of avacopan in ANCA-associated vasculitis. … The ADVOCATE
> data marked a critical turning point, in my view, in the treatment of this debilitating
> disease, with avacopan demonstrating superiority over the current standard of care

which employs daily dosing of glucocorticoids. Those results transformed not just thousands of lives potentially, but changed the face of our enterprise as well. We intend to file an NDA for avacopan with the FDA by the middle of this year, and are laying the groundwork for US commercialization. Furthermore, the success of ADVOCATE not only validated the biology of C5a receptor inhibition by avacopan as a powerful therapy but it surpassed expectations and may open doors to additional renal disease opportunities in underserved indications such as lupus nephritis. The momentous readout in ADVOCATE now sets the stage for a data-rich 2020, during which we expect to share topline results from four additional ongoing clinical trials. An epochal year for CCXI was 2019, and we expect 2020 to be extraordinary as well.

42.     ChemoCentryx's March 10, 2020 press release also listed certain "Key Highlights," including:

Exceeded expectations for avacopan with topline data from the ADVOCATE Phase III pivotal clinical trial announced in the fourth quarter of 2019, which demonstrated avacopan's statistical superiority in sustaining remission at 52 weeks over the prednisone-containing standard-of-care, eliminating the need for daily noxious steroids. Avacopan was shown to lower all four aspects of the total burden of disease: stopping active vasculitis; significantly lowering current therapy-induced illness, with a statistically significant reduction in the Glucocorticoid Toxicity Index (GTI) and other accepted assessments of glucocorticoid toxicity; significantly improving kidney function as evidenced by a marked improvement in Estimated Glomerular Filtration Rate, or eGFR; and statistically significant improvements in quality of life.

This press release also contained substantially similar language to the language quoted *supra* in ¶ 36.

43.     Also on March 10, 2020, ChemoCentryx held a call with analysts to discuss its Fourth Quarter and Full Year 2019 Financial Results.  On the call, Defendant Schall stated:

The result of the ADVOCATE trial surpassed all of our expectations and could mark a critical turning point in the treatment of this devastating, debilitating and life-threatening disease. The avacopan value proposition that we tested in the ADVOCATE trial was fourfold, as shown on Slide 5.

One, to stop the acute active vasculitis crisis in ANCA patients by stifling the activation of disease-causing neutrophils. These neutrophils are thought to be driven by the C5a receptor, which is the molecular target of avacopan. Two, by using avacopan instead of chronic daily steroids to eliminate illnesses caused by the current standard daily steroid therapy. Three, to stop the accumulation of organ damage, particularly and notably in the kidney. And four, to improve the all too often miserable quality of life of ANCA patients.

So let me briefly summarize the top line results, which you can find on Slide 6. First, you'll see that avacopan was numerically superior and statistically non-inferior to the daily steroid-containing active comparator at 26 weeks in achieving remission that is in stopping active vasculitis as measured by the Birmingham Vasculitis Activity Score, or BVAS, which was the tool used for the primary efficacy endpoints used in this trial.

After 52 weeks of treatment, the avacopan therapy sustained remission at a rate of 65.7% compared to 54.9% in the active comparator arm. Not only was this numerically and statistically non-inferior to the incumbent standard of care, but this result was highly statistically significant for the superiority of avacopan in terms of sustained remission after 1 year.

Next, avacopan has achieved statistical superiority in reducing the illnesses that are associated with the use of steroids in the active comparator treatment, as compared -- or as measured, rather, by the Glucocorticoid Toxicity Index, a comprehensive quantitative scoring system developed by expert clinicians over the course of some years.

Third, avacopan showed a statistically significant improvement over the active comparator in Estimated Glomerular Filtration Rate, or eGFR. While our goal was originally to stabilize kidney function to save the kidney, it looks as though with avacopan, kidney function actually improves. This perhaps is the single data point that nephrologists are most interested in, and it has been a key factor as we contemplate future opportunities for avacopan, of which I will speak momentarily.

Finally, you can see that avacopan therapy was numerically superior to the active comparator standard of care in all 10 of 10 of the measurements and at each of the time points measured, while showing a statistically significant improvement in 6 of the 10 measurement categories assessed by the SF-36 validated quality of life instrument. Moreover, avacopan was also statistically significantly better in the European index, EuroQOL-5D-5L.

Avacopan thus demonstrated the ability to actually improve the quality of life over 1 year of treatment compared to a deterioration for those in the daily steroid-containing active comparator arm, a remarkable change in how patients perceive and report their health with an instrument validated by regulatory authorities.

Avacopan superiority here includes physical and emotional functioning, including a significant improvement in the crucial category of vitality, which is so important in allowing patients to return to normal lives, with obvious socioeconomic benefits.

The top line safety results revealed an acceptable safety profile in the serious and life-threatening disease, with fewer subjects having serious adverse events in the

-12-

avacopan group than in the daily steroid-containing active comparator. Putting this all together, we believe avacopan has a very strong value proposition as it demonstrated progress in all 4 key elements of the total burden of a disease, which leads thousands of lengthy -- to thousands of lengthy hospitalizations each and every year.

44.     During the March 10, 2020 call, a JPMorgan analyst asked about the potential pricing of avacopan after it is approved and reaches the market.  In response, Schall stated, "I will say that the robustness of the [ADVOCATE] data, the superiority to the standard of care, the elimination of problems that standard of care brings to the table with glucocorticoid toxicities, the improvement in the quality of life, which does have direct pharmaeconomic impact, and the renal improvements … that might suggest that our price should be robust."

45.     On May 4, 2020, ChemoCentryx issued a press release announcing that it would hold its First Quarter Financial Results Conference Call on May 11, 2020.  The press release contained language substantially similar to the language quoted *supra* in ¶ 36.

46.     On May 11, 2020, ChemoCentryx issued a press release announcing its First Quarter Financial Results.  In the press release, Defendant Schall stated, "We are actively preparing our NDA submission to the FDA following the positive results of the Phase III ADVOCATE trial of avacopan for the treatment of ANCA vasculitis."  The press release also identified certain "Key Highlights," including that the Company is, "On track to file the NDA for avacopan in the treatment of ANCA-associated vasculitis in mid-2020, following the ADVOCATE Phase III pivotal clinical trial, which demonstrated avacopan's statistical superiority in sustaining remission at 52 weeks over the prednisone-containing standard-of-care." The press release also contained language substantially similar to the language quoted *supra* in ¶ 36.

47.     Also on May 11, 2020, the Company held an earnings call to discuss its First Quarter 2020 Financial Results.  On this call, Defendant Schall stated:

Our dialogue with the FDA continues on track, and we are on schedule to file our NDA for avacopan mid this year. Our confidence that we will meet this target was high to start with and has grown with each week that passes. It is a confidence that is founded upon what we consider to be the superlative results achieved in the pivotal Phase III ADVOCATE clinical trial in which avacopan demonstrated statistical superiority in sustained disease remission during 1 year of treatment

versus the current steroid-containing standard of care group. This exceeded most expectations since the trial was not powered for superiority. Overall, the ADVOCATE trial revealed a compelling value proposition for avacopan and ANCA in the form of an all-around ability to reduce the total burden of ANCA-related disease.

Notably, beyond bringing the disease symptoms into remission and sustaining people in remission, as mentioned above, in addition, avacopan therapy significantly reduced the illnesses associated with the use of steroids, significantly improved kidney function over 52 weeks and actually improved quality of life, in contrast to the deterioration in quality of life in those patients on the steroid-containing standard of care.

48.    On June 10, 2020, ChemoCentryx announced plans to commence an underwritten public offering of its common stock.  On the same day, the Company filed a Prospectus on Form 424B5 with the SEC.  The Prospectus stated, in relevant part:

In November 2019, we announced positive topline data from the pivotal Phase III ADVOCATE trial of avacopan, our lead drug candidate that is an orally-administered selective complement 5a receptor inhibitor, for the treatment of patients with anti-neutrophil cytoplasmic antibody-associated vasculitis, or ANCA vasculitis. The ADVOCATE trial compared avacopan with the currently used standard of care regimen which consists of high doses of glucocorticoid (most commonly prednisone) which is administered to patients for months. The prednisone standard of care was the active comparator (prednisone active comparator standard of care, or SOC) against which avacopan was assessed in the a [sic] two-armed, randomized, controlled, and blinded trial. Subjects in both study arms received background therapy with rituximab or cyclophosphamide. The trial met both of its primary endpoints, showing that avacopan therapy without the need for daily prednisone could achieve disease remission at 26 weeks and sustained remission at 52 weeks, as assessed by the Birmingham Vasculitis Activity Score, or BVAS. BVAS remission at week 26 in the avacopan treated subjects was numerically superior and statistically non-inferior to the prednisone active comparator SOC control group, where BVAS remission was achieved in 72.3% of the avacopan treated subjects vs. 70.1% of subjects in the prednisone active comparator SOC control group (p<0.0001 for non-inferiority). Sustained remission at 52 weeks was observed in 65.7% of the avacopan treated subjects vs. 54.9% in the prednisone active comparator SOC control group, achieving both non-inferiority and superiority to prednisone active comparator SOC (p=0.0066 for superiority of avacopan). Reduction in overall burden of disease management and improvement in quality of life was also demonstrated through key secondary endpoints, including improved kidney function and reduction of adverse events and illnesses associated with steroids, such as prednisone.

We plan to file a New Drug Application, or NDA, with the U.S. Food and Drug Administration, or FDA, in mid-2020 and, if the NDA is approved, to

-14-

commercialize avacopan in the United States on our own and internationally through our kidney health alliance with Vifor Fresenius Medical Care Renal Pharma Ltd. and its affiliates and sublicensees, or collectively, Vifor. …

…

We have successfully completed and reported positive topline clinical data from our pivotal Phase III clinical trial of avacopan for the treatment of ANCA vasculitis, known as the ADVOCATE trial. ADVOCATE was a randomized, double-blind, active-controlled worldwide clinical trial which enrolled 331 patients with newly diagnosed or relapsing ANCA vasculitis at approximately 200 sites in the United States, Canada, Europe, Australia, New Zealand and Japan. The aim of the trial was to assess the safety and efficacy of avacopan in inducing and sustaining remission in patients with ANCA vasculitis.

49.     On June 15, 2020, ChemoCentryx announced that its public offering of 5.2 million shares of its common stock had closed, and that the underwriters thereof exercised in full their option to purchase an additional 780,000 shares.  All shares were sold by ChemoCentryx at the price of $58.00 each.  Net proceeds to ChemoCentryx, after deducting underwriting discounts, commissions, and estimated offering costs, were $325.4 million.

50.     On July 9, 2020, the Company announced that it had submitted its NDA to the FDA for avacopan in ANCA-associated vasculitis.  In its press release announcing the submission, ChemoCentryx stated:

The Company's NDA submission is supported by the results of its pivotal Phase III ADVOCATE trial, which demonstrated statistical superiority in sustaining remission at 52 weeks in the avacopan group compared to the prednisone group. In the trial, the avacopan group also showed significantly lower glucocorticoid toxicity, greater improvement in kidney function and greater improvement in health-related quality of life measures compared to the prednisone group. Finally, avacopan demonstrated favorable safety results in this serious and life-threatening disease, with fewer subjects having serious adverse events in the avacopan group than in the prednisone group.

51.     The press release also quoted Defendant Schall as stating:

We have achieved a major landmark for ChemoCentryx with the submission of the NDA for avacopan in ANCA-associated vasculitis following our highly successful Phase III ADVOCATE trial. … There is an urgent need for a non-immunosuppressive, targeted therapy that can achieve and sustain remission in this organ- and life-threatening disease, while reducing the toxicities associated with daily steroid use. Submission of our NDA is a critical step toward addressing this unmet need, as we seek to improve patients' lives.

-15-

Class Action Complaint for Violation of the Federal Securities Laws

52.     On August 3, 2020, ChemoCentryx issued a press release announcing that it would hold a Second Quarter 2020 Financial Results Conference Call on August 10, 2020.  The press release also stated, "ChemoCentryx's lead drug candidate, avacopan (CCX168), successfully completed a pivotal Phase III trial in ANCA-associated vasculitis."

53.     On August 4, 2020, ChemoCentryx issued a press release announcing that Defendant Schall would present at two upcoming investor conferences on August 11, 2020 and August 12, 2020.  The press release also contained language substantially similar to the language quoted *supra* in ¶ 52.

54.     On August 10, 2020, ChemoCentryx issued a press release announcing its Second Quarter 2020 Financial Results.  In the press release, Defendant Schall stated, "A major milestone was accomplished recently with the filing of the NDA for avacopan for the treatment of ANCA-associated vasculitis with the U.S. FDA.  This is one more crucial step toward achieving our unwavering goal of changing the treatment paradigm for people now enduring this organ-threatening and life-endangering disease."   The press release also contained language substantially similar to the language quoted *supra* in ¶ 52.

55.     The August 10, 2020 press release also identified certain "Key Highlights," including that the Company had:

> Filed the New Drug Application (NDA) for avacopan in the treatment of ANCA-associated vasculitis in July. The Company's NDA submission is supported by the results of its pivotal Phase III ADVOCATE trial, which demonstrated statistical superiority in sustaining remission at 52 weeks in the avacopan group compared to the prednisone group. In the trial, the avacopan group also showed significantly lower glucocorticoid toxicity, greater improvement in kidney function and greater improvement in health-related quality of life measures compared to the prednisone group.

56.     Also on August 10, 2020, ChemoCentryx held a call with analysts to discuss its Second Quarter 2020 Financial Results.  On this call, Defendant Schall stated that "[f]rom ADVOCATE, there was good news here, too.  A statistically significant improvement in clinically validated measurements of quality of life on avacopan therapy.  And overall, avacopan also demonstrated a favorable safety result in this serious and life-threatening disease with fewer

subjects having fewer numbers of serious adverse events in the avacopan group than in the steroid standard of care group."

57.    Defendant Schall further stated on the same call:

In the ANCA patient population, they're on background therapy for their disease. They're on also an amazing number, typically an amazing number of concomitant medications to control other complications of the therapy, prophylaxis for Pneumocystis jirovecii as a consequence of being under high doses of glucocorticoids and/or cyclophosphamide and rituximab. So that has its own problem, that conmed. They're trying to control their incipient diabetes and some of the bone problems with conmeds. They're really, really a challenged patient population. And one hopes going back to avacopan in ANCA vasculitis, by removing some of the need for these broadly immunosuppressive therapies, we also get rid of some of these nasty conmeds that give them so many AEs and SAEs.

But even there in ANCA, we could show 40% fewer number of severe AEs in the avacopan group versus the prednisone standard of care group. So there is, seems to be, at many levels, very good safety advantages to using avacopan. But again, we'll let regulators and other sift through the data sets, and I won't say any more about that since it's under a filing right now. But it is pretty clear to us that HS population is, by and large, notwithstanding the fact that they have this really debilitating illness, and that causes them a lot of discomfort and pain in many areas of life physically and emotionally, they are, by and large, not under the burden of quite so many concomitant medications. And the safety database, although still blinded, the suggestion is that we have far fewer, across the board, safety events just in this patient population, full stop. And again, even in the blinded data set, nothing that seems out of the ordinary for this patient population.

So I think when the data come out, it will certainly add to and fundamentally enhance the picture of safety around avacopan, which we believe, based on evidence to date, both preclinical, off clinical, number of species and humans, both healthy and with ANCA vasculitis population, we believe will be a very supportive data package on safety as well. So we hope it will just further enhance that package.

58.    On September 8, 2020, ChemoCentryx issued a press release announcing that Defendant Schall would speak at the H.C. Wainwright 22nd Annual Global Investment Conference on September 15, 2020.  The press release also contained language substantially similar to the language quoted *supra* in ¶ 52.

59.     On September 17, 2020, ChemoCentryx issued a press release announcing that the FDA had accepted the avacopan NDA and set a Prescription Drug User Fee Act ("PDUFA") goal data of July 7, 2021.  The press release stated:

> The NDA included data from the global, Phase III ADVOCATE trial, which demonstrated statistical superiority in sustaining remission at 52 weeks in the avacopan group compared to the prednisone group. In the trial, the avacopan group also showed significantly lower glucocorticoid toxicity, greater improvement in kidney function and greater improvement in health-related quality of life measures compared to the prednisone group. Finally, avacopan demonstrated favorable safety results, with fewer patients having serious adverse events in the avacopan group than in the prednisone group.

60.     On October 28, 2020, ChemoCentryx held an investor call to discuss the results of a separate trial of avacopan for a different condition.  On the call, Defendant Schall stated, "Avacopan has already proved to be highly successful, as many of you know, in the pivotal Phase III ADVOCATE trial of patients in another underserved disease, ANCA-associated vasculitis."

61.     On November 2, 2020, ChemoCentryx issued a press release announcing that the Company would hold a Third Quarter 2020 Financial Results Conference Call on November 9, 2020.  The press release also contained language substantially similar to the language quoted *supra* in ¶ 52.

62.     On November 6, 2020, ChemoCentryx issued a press release announcing that the American College of Rheumatology's annual meeting held that day would feature a plenary session presentation on the ADVOCATE Phase III trial results.  The press release further stated, ADVOCATE "showed that avacopan was as effective as prednisone therapy in bringing patients into remission by 26 weeks, and superior to prednisone for sustained remission after 52 weeks. In addition, the avacopan group had greater improvement in renal function compared to standard prednisone therapy."

63.     On November 9, 2020, ChemoCentryx held an earnings call to discuss its Third Quarter 2020 Financial Results.  On this call, Defendant Schall stated:

> As many of you know, the cornerstone of our submission to the regulatory agencies has been the data from the pivotal Phase III ADVOCATE clinical trial, which demonstrated statistical superiority of the avacopan group and sustaining

-18-

Class Action Complaint for Violation of the Federal Securities Laws

remission at 52 weeks compared to the prednisone group. The results of the ADVOCATE study were presented last month in an oral abstract session during the American Society of Nephrology's Kidney Week 2020 Reimagined Meeting. They were presented by the renowned nephrologist, David Jayne, MD, Professor of Clinical Autoimmunity at the University of Cambridge in England. Dr. Jayne's presentation highlighted the potential of avacopan to offer new hope to patients who suffer from this incurable orphan disease. And just this last Friday, no less an expert than Professor Peter Merkel, MD, the Chief of Rheumatology at the University of Pennsylvania, gave a plenary session at -- on the ADVOCATE results at the American College of Rheumatology Convergence 2020 Meeting.

Professor Merkel delved into many important aspects of the avacopan data set, including highlighting some important features at both weeks 26 and weeks 52 in the trial result. As Dr. Merkel put it, and I'm alluding now to slide -- the next slide in the deck that you can see with the week 26 and 52 data. As Dr. Merkel put it, there are some intriguing findings to explore in the subgroups. Patients who had relapsing disease had even better benefit from avacopan at 26 and week 52. However, this should not imply that patients with newly diagnosed disease did not benefit from avacopan, because while remission rates with avacopan in newly diagnosed were about the same as the Prednisone group, remember, the patients receiving avacopan achieved this benefit without receiving daily glucocorticoids and their negative consequences. Similarly, said Professor Merkel, there were findings that patients who were MPO-positive received extra benefit and the patients who received rituximab as background therapy, seemed to receive extra benefit as well.

64.     On the same call, a Cannacord Genuity Corp. analyst asked, "Did the FDA indicate any review issues?  And is there any update around the agency's view around an AdCom?"  Defendant Schall responded:

All of our interactions with the agency so far, again, without going into any real detail because we are under review. But to my mind, have been straightforward and expected. And I think we have ready access and have had ready access to all the answers so far for the queries. So I have not seen personally anything unusual or anything that, again, we did not fundamentally anticipate and for which we've been, quite frankly, ready. So I think it's going forward in a very reasonable, straightforward, logical way. And again, I won't say anything more than that because I'm sensitive to making sure we're not talking too much about a file under review.

AdCom, we expect to know something more definite after the FDA's mid-cycle meeting. And I think probably the public calendars will tell you what that is. As soon as we know, we will let the community know. We have always, even before we filed the NDA, been presuming and preparing for an AdCom. Why is that? Number one, this is a new medical entity. It's not been reviewed or approved for any other indication, already kind of putting you into the presumptive AdCom

bucket, at least in my view, historically. Second, we're dealing with an orphan indication in ANCA vasculitis. And frankly, the agency has only truly reviewed an ANCA registration package but once before. And that was when rituximab, given in combination with the daily glucocorticoids was offered as an alternative to cyclophosphamide given in combination with daily glucocorticoids. And that was some time ago. So it's not as if it's a garden-variety indication where it's formulaic in terms of how to review an application. So again, oftentimes, that will trigger an AdCom.

65.   On this same November 9, 2020 earnings call, Defendant Schall further stated:

I hate to even presume to think about what the agency might think or say and certainly don't want to think -- to discuss any discussions with them until those are all done. But let me put it this way. Look, fundamentally, this is the longest randomized trial ever done in ANCA vasculitis, right? The randomized blinded trial, 52 weeks, continuous dosing and following. Look, that's not been done before. So we've got the biggest data set by 6 months. That's important because it informs a lot of discussions. So without thinking yet about what the agency may or may not say, they'll look at the data in their own way, obviously, but the data kind of speak for themselves. But I will tell you this, it sounds like we're already informing new discussions in the physician community, because the fact of the matter is, if you have, a, evidence that the hardest people to treat, the anti-MPO relapsers are pretty -- are notoriously difficult to treat. The MPA diagnosis, which goes along more or less with MPO-positivity, really difficult to get a handle on, especially with relapsers.

But fundamentally, I think the more subtle and for me, the more profound point is that, my goodness, when you look at the fact that avacopan not only had a really just a general improvement in relapse risk -- reducing relapse risk by some 54% and those were 2 charts shown in these meetings as Kaplan-Meier graphs where avacopan was clearly advantageous in the population. And part of that comes from that really interesting advantage that avacopan has with -- when given with rituximab as background therapy versus daily prednisone with rituximab as background therapy. 71% still in remission at week 52 versus 56% with the prednisone group. The important point here is we ran this trial according to rituximab's label at the time. And it was fully enrolled under the old rituximab label, which was you don't give rituximab except for that first course of therapy, that's 4 weekly infusions, spaced by a week. So they get up to 4 weeks. You don't top them up after that under the original label.

This data, some people have criticized us for that, like we had a choice to begin with, which we didn't. But in fact, the more enlightened discussions that I've heard, especially recently are no, the data actually show you don't need to keep immunosuppressing people with rituximab. That's a large end, 107 people per group were following. So they didn't get ritux -- they're totally matched except for prednisone versus avacopan. They didn't get any additional rituximab. So avacopan was kind of monotherapy, right? They didn't get any azathioprine or

Class Action Complaint for Violation of the Federal Securities Laws

anything else after the ritux. And people are really, really markedly in remission at the end of 52 weeks. So that's an important discussion to have. So I don't know how that will play out. And again, I don't want to make too much or too little of that observation, but I think it's compelling, and I think it's starting to inform some new discussions.

66.     Also on the November 9, 2020 call, a Raymond James & Associates, Inc. analyst asked, "just want to get your current thoughts on pricing this drug in the ANCA vasculitis market." In response, Defendant Schall stated:

I will tell you this. The advantages, not just with certain things we've seen in the data from ADVOCATE, the superiority in keeping people "in remission." And again, remission is defined by that narrow Birmingham Vasculitis Activity with avacopan, but in a superior way to glucocorticoids, which has pharmacoeconomic implications. But in addition, when we talk about the broader total burden of disease, we added quality of life. We added measurements of reduced glucocorticoid toxicities. It does appear that we're making people better, well to some degree with avacopan, when they're not having that in the standard of care. And then finally, the kidney implications of improving the renal function over 52 weeks, those had profound effects.

So I would say this, we've always guided towards a normal orphan pricing corridor, upwards of $200,000 per patient per year; at the lower end, $100,000 per patient per year. I think our demand research and our payer primary research to date is supporting what certain correspondents have been telling us. The data set might support something more towards the top end of that than the lower end.

67.     On November 19, 2020, ChemoCentryx issued a press release announcing that Defendant Schall would speak at two upcoming investor conferences on November 23, 2020 and December 3, 2020. The press release also stated, "ChemoCentryx's lead drug candidate, avacopan (CCX168), successfully completed a pivotal Phase III trial in ANCA-associated vasculitis and a New Drug Application is under review by the U.S. Food and Drug Administration."

68.     On January 13, 2021, ChemoCentryx participated in a JPMorgan Healthcare Conference call. On this call, Defendant Schall stated:

With avacopan, in ANCA vasculitis, we set out to show something that had never been done for ANCA patients before, and I believe we succeeded. Standard prednisone therapy only stops that active vasculitis ... We thought we could do that as well or better with avacopan without the need for long-term daily prednisone therapy. And don't forget that in treating ANCA vasculitis with

-21-

prednisone, the glucocorticoid itself causes many illnesses not related to the original ANCA disease. It's really trading one set of problems for another.

But by eliminating the need for daily prednisone therapy with avacopan, we reasoned that we could significantly reduce steroid-related toxicities ... And in so doing, we aim with avacopan to stop the progressive failure of critical organs such as the kidney … and improve the quality of life overall for ANCA patients ... Data with avacopan in the ADVOCATE Phase III pivotal clinical trial in ANCA vasculitis demonstrated that we could indeed do all of these things.

… [F]irst, the ADVOCATE trial showed that with avacopan, the need for daily prednisone therapy is eliminated, yet symptomatic remission is as good or better with avacopan compared to the traditional standard of care, which is the prednisone-based therapy.

And … avacopan doesn't just bring ANCA patients into remission by, say, month 6 or 12, avacopan keeps them in remission, significantly better than standard prednisone-based therapy, thereby significantly lowering the risk of relapse in ANCA vasculitis. Now this is important because every relapse carries with it some irreversible organ damage. And the evidence shows that daily dosing of avacopan is highly effective, indeed more effective than daily prednisone-based therapy at keeping patients from the otherwise debilitating and progressive effects of ANCA that can otherwise threaten their organs such as the kidney or even their lives.

… Let us be clear, the evidence from the ADVOCATE trial overall strongly indicates that avacopan has the potential to change the treatment paradigm in ANCA vasculitis. As I mentioned, the need for daily prednisone therapy is eliminated, yet symptomatic remission is as good or indeed superior with avacopan compared to prednisone therapy and people relapse significantly less. And by eliminating the need for daily prednisone, avacopan therapy was associated with statistically significant fewer steroid-related toxicities.

Avacopan therapy also led to a significant improvement in kidney function versus the standard prednisone-based therapy. This is a finding of enormous patient benefit, large pharmacoeconomic implications.

69.     On February 17, 2021, ChemoCentryx issued a press release announcing that the "Results of the Pivotal Phase III ADVOCATE Trial of Avacopan for the Treatment of ANCA-Associated Vasculitis" would be published in *The New England Journal of Medicine*.  The press release stated:

-22-

Class Action Complaint for Violation of the Federal Securities Laws

ANCA-associated vasculitis is a systemic auto-immune disease in which over-activation of the complement system further activates neutrophils, leading to inflammation and eventual destruction of small blood vessels. This results in organ damage and failure, with the kidney as the major target, and is fatal if not treated.

"The results of the ADVOCATE trial are transformational and demonstrate the potential of avacopan to offer a substantial change in the treatment paradigm for ANCA-associated vasculitis," said Peter A. Merkel, M.D., MPH, Chief of Rheumatology and Professor of Medicine and Epidemiology at the University of Pennsylvania. "Current treatment for ANCA-associated vasculitis consists of combining months of daily glucocorticoids ("steroids" such as prednisone) with other immunosuppressive medications. Use of prednisone is associated with significant side-effects, including infections, diabetes mellitus, weight gain, and other problems. The ability of avacopan to replace prednisone and help patients achieve sustained remission is a significant and exciting advance for the treatment of patients with ANCA-associated vasculitis."

"The ADVOCATE trial clearly demonstrates avacopan's ability to improve kidney function, measured by eGFR, in ANCA-associated vasculitis, and was recently reinforced in another orphan kidney disease, C3 Glomerulopathy. This is a significant advantage over other treatment options that often come with added toxicities and will likely lead to reduced risk of kidney failure over the longer term," said David Jayne, M.D., Director of the Vasculitis and Lupus Service, Addenbrooke's Hospital in Cambridge.

The ADVOCATE trial was a global, randomized, double-blind, active-controlled, double-dummy Phase III trial in 331 patients with ANCA-associated vasculitis in 20 countries. Eligible patients were randomized to receive either avacopan or oral prednisone. In addition, all patients received standard background therapy of either: (a) rituximab for 4 weeks; or (b) cyclophosphamide for 13 weeks followed by azathioprine/mycophenolate, evenly balanced between the avacopan and prednisone groups.

The study met both of its primary endpoints, demonstrating disease remission at 26 weeks and sustained remission at 52 weeks, as assessed by the Birmingham Vasculitis Activity Score (BVAS). Specifically, BVAS remission at week 26 was achieved in 72.3% of the avacopan treated patients vs. 70.1% of subjects in the prednisone group (p<0.0001 for non-inferiority). Sustained remission at 52 weeks was observed in 65.7% of the avacopan treated subjects vs. 54.9% in the prednisone group, achieving both non-inferiority and superiority to the prednisone group (p=0.007 for superiority of avacopan).

Additionally, results published in the NEJM also show that, compared to the prednisone group, avacopan treatment:

-23-

Class Action Complaint for Violation of the Federal Securities Laws

- Reduced the risk of vasculitis relapse by 54%; there was a 10.1% relapse rate in the avacopan group compared to 21.0% in the prednisone group.

- Demonstrated greater improvement in kidney function, with a mean increase from baseline to week 52 in estimated glomerular filtration rate (eGFR) of 7.3 mL/min/1.73 m2 with avacopan therapy vs. an increase in eGFR of 4.1 mL/min/1.73 m2 in the prednisone group, and the difference between groups was 3.2 mL/min/1.73 m2 (95% CI, 0.3 to 6.1).

- Significantly lowered glucocorticoid toxicity, with avacopan therapy 39.7 vs. 56.6 in the prednisone group in the Glucocorticoid Toxicity Index (GTI) Cumulative Worsening Score with a difference between groups of −16.8 points (95% CI, −25.6 to −8.0), and 11.2 with avacopan therapy vs. 23.4 for the prednisone group in the GTI Aggregate Improvement Score, with a difference between groups of −12.1 points (95% CI, −21.1 to −3.2).

- Led to greater improvement in health-related quality of life, measured by the Short Form 36 (SF-36) version 2 and the EuroQOL-5D-5L instrument (both Visual Analogue Scale and EQ Index), compared to the prednisone group.

Avacopan demonstrated favorable safety results in this serious and life-threatening disease, with fewer subjects having serious adverse events in the avacopan group than in the prednisone group.

The U.S. Food and Drug Administration (FDA) is evaluating avacopan for the treatment of ANCA-associated vasculitis and has set a Prescription Drug User Fee Act (PDUFA) target goal date of July 7, 2021.

70.     On February 23, 2021, ChemoCentryx issued a press release announcing that the Company would hold a Fourth Quarter and Full Year 2020 Financial Results Conference Call on March 1, 2021.  The press release also contained language substantially similar to the language quoted *supra* in ¶ 67.

71.     On February 25, 2021, ChemoCentryx issued a press release announcing that Defendant Schall would speak at two upcoming investor conferences on March 3, 2021 and March 9, 2021.  The press release also contained language substantially similar to the language quoted *supra* in ¶ 67.

72.     On March 1, 2021, ChemoCentryx reported its Fourth Quarter and Full Year 2020 Financial Results.  On the same day, the Company issued a press release announcing these results. In the press release, Defendant Schall stated:

Inexorably our march of progress advances, drummed on by the call to improve the lives of patients enduring diseases with grossly inadequate treatments … With regulatory applications for avacopan in ANCA-associated vasculitis accepted for review on three continents, we are preparing for our first commercial launch. In my view, avacopan has the potential to transform the lives of patients suffering from debilitating and intractable diseases, as demonstrated by the results not just in ANCA-associated vasculitis but also from our clinical trials in HS and C3G. We plan to launch a Phase III trial of avacopan in patients with severe HS in 2021, and to discuss the regulatory pathway for avacopan in C3G.

73.    Also on March 1, 2021, ChemoCentryx held an earnings call to discuss its Fourth Quarter 2020 and Full Year Financial Results.  On this call, Schall stated, "I will remind you that the ADVOCATE trial … demonstrated that avacopan achieved statistical superiority of sustained remission at 52 weeks over the traditional prednisone-based therapy and did this while eliminating the need for daily oral prednisone.  And by thus, eliminating the need for daily prednisone therapy with avacopan, avacopan therapy was also associated with a statistically significant reduction in steroid-related toxicities."

74.    On the same March 1, 2021 call, Defendant Schall discussed the ADVOCATE trial design, stating, "we wanted to totally get rid of what patients complained about most and what physicians tend to hate as well, that daily oral prednisone, the need for daily oral prednisone is something that everyone hates.  We designed the trial to do just that."  He then touted the success of ADVOCATE, specifically, "we showed really in the simplest incarnation that with avacopan, you can eliminate the need for daily prednisone dosing upon which most of the therapy is centered in ANCA vasculitis today.  So I think that's major.  And I think that's the message that is sinking in."

75.    On April 22, 2021, ChemoCentryx issued a press release announcing that the Company would hold a First Quarter 2021 Financial Results Conference Call on April 29, 2021. The press release also contained language substantially similar to the language quoted *supra* in ¶ 67.

76.    On April 29, 2021, just days before the FDA released its Briefing Document, ChemoCentryx issued a press release reporting its First Quarter 2021 Financial Results.  In the press release, Defendant Schall stated:

Class Action Complaint for Violation of the Federal Securities Laws

Momentum builds with each passing quarter, bringing us closer to our goal of bringing novel, precisely targeted medicine to those that need it most. … At our R&D Day earlier this month, two world-renowned clinicians outlined the unmet needs in ANCA-associated vasculitis and the data driving their conviction that avacopan could become a landscape-changing therapy. We are well prepared and look forward to providing our views at the FDA Advisory Committee meeting on this topic in just a few days.

77.     Also on April 29, 2021, ChemoCentryx held a call with analysts to discuss its First Quarter 2021 Financial Results.  On the call, Defendant Schall stated:

I think there's a lot of misconceptions about what is current "standard of care" there and there are some facts that have changed since we started the trial. But let me put it -- let me be very clear. We tried to make the ADVOCATE trial as close to real-world practice as possible. I -- that includes steroid regimen and tapering, both then best practice and, in fact, that's now best practice. We tried to make the background medication of either cyclophosphamide or rituximab as close to real-world practice. And in fact, we were completely aligning ourselves with the label of all those medications at the time, including rituximab.

So what we got was an excellent trial design that reflected then real world practice. And still, to a large extent now, the one thing that has changed is rituximab label was expanded towards the very end of the ADVOCATE trial by the way to allow for increased frequency of dosing. So before it was essentially one regimen at the start of the treatment phase, which is 4 infusions spaced by 1 week. And now you can top up according to the label as frequently as every 6 months or so.

Now while that is becoming an emerging paradigm, especially for patients that have a history of ANCA-associated vasculitis with relapse, the latest figures I saw, by the way, for newly diagnosed disease, I don't know if that's yet been adopted as the majority paradigm. So I think while rituximab's label has expanded fairly recently, I'm not sure I would call it exactly a changed standard of care. But it is a very fair point to say, "Well, look, rituximab is used ever more frequently." All the better the features of the ADVOCATE trial actually allow us to leapfrog to what I think is the gold standard, which would be better for a maintenance therapy once people are quiescent. How would you do that trial? You do a double-blind, randomized placebo-controlled trial.

And as I referred to in my remarks, de facto, you can get some of that information from weeks 26 to 52 in the ADVOCATE trial from the 65% of the people in that trial who had avacopan plus rituximab as a start and then went on to have no further medication as the trial were [sic] on. So they didn't get tapped up with rituximab. What did we see? We saw about a 71% sustained remission in the avacopan group versus a 50 -- middle 50% remission in the prednisone group. And this is the rituximab's staff alone. And it's not a tiny number of people. It's 200-plus people. So it's bigger than the whole RAVE trial.

-26-

So what that tells us is that we have a very good way of maintaining remission after people get to a quiescent state at that first 26 weeks, and there isn't a need to give them necessarily more rituximab. And rituximab is not without its consequences. So it's at least an observation. Is it a trial designed to answer that question? No. But it is a feature of this trial that does shed light on that question. Could avacopan be used as a monotherapy in a maintenance surgery? And the answer is, well, these data suggest that it could. …

So I think that's how best I would answer the question. We did an excellent trial. We reflect standard real-world practices at the time and still. And the fact that we didn't add additional rituximab actually gives a feature to our trial, which I think is very valuable. Finally, again, rituximab is a changing landscape. It's not used routinely, I think, even at this point, for newly diagnosed people in the second 6 months. It's mostly reserved for people with the history of relapse. So that's -- I think that's what I would put to the community at this point. It's again a set of observations based on data.

78.     On the same April 29, 2021 call, Defendant Schall stated, "we have now received the FDA's briefing book for the Advisory Committee, the document is not ours, but the FDA's, and it is confidential.  And therefore, we will not be commenting on it today.  However, we do expect the FDA to make the materials available publicly before the AdCom meeting date.  We expected the FDA to pressure test our NDA, as would be normal for any AdCom meeting."

79.     Also on the April 29, 2021 call, a Piper Sandler & Co. analyst asked, "I'm scratching my head to see what the FDA could really kind of find fault with.  And I guess the one question I keep coming back to is, does the FDA recognize – and again, not asking you to put words in their mouth, but do they recognize how bad of an actor the steroids are?  And do you think there needs to be further education there?  Or do they understand and accept that?" Schall replied, "Steroids maim and kill, full stop.  And until you see that, until you live with it, you just don't – you can't grasp it. So I can't speak for the FDA.  I'm sure there are many fine professionals who have clinical experience, maybe even seen this disease.  But … you just don't get it until you see it first hand.  So that's – I'll just leave the question there."

80.     Defendants' statements identified above in ¶¶ 29-48, 50-79 were materially false and misleading when made because: (1) ChemoCentryx's design for the ADVOCATE Phase III trial was fundamentally flawed, which raised questions about the interpretability of the trial data and the ability to define a clinically meaningful benefit of avacopan and its role in the treatment

of ANCA-associated vasculitis; (2) the results from the ADVOCATE trial raised serious safety concerns for avacopan; and (3) these issues raised significant doubt about the viability of ChemoCentryx's NDA for avacopan for the treatment of ANCA-associated vasculitis.  As a result, Defendants' statements about the ADVOCATE trial design, and efficacy and safety results were materially false and misleading at all relevant times.

**The Truth Begins To Be Revealed**

81.    On May 4, 2021, the FDA released the Briefing Document concerning ChemoCentryx's NDA for avacopan in advance of the May 6, 2021 Advisory Committee meeting.  In the Briefing Document, the FDA noted that ChemoCentryx had "submitted the results of a single phase 3 study, CL010_168, and two phase 2 studies, CL002_168 and CL003_168.  The focus of the AAC discussion will be data from Study CL010_168, also referred to as ADVOCATE, that compared avacopan to standard of care … in patients with AAV; patients in both arms received a background of either rituximab or cyclophosphamide standard induction regimen."  The FDA found that: "*[c]omplexities of the study design, as detailed in the briefing document, raise questions about the interpretability of the data to define a clinically meaningful benefit of avacopan and its role in the management of AAV*."

82.    The FDA further stated: "[a]lthough primary efficacy comparisons were statistically significant, *the review team has identified several areas of concern, raising uncertainties about the interpretability of these data and the clinical meaningfulness of these results*."  The FDA's concerns included:

> (1) At Week 26, the proportion of patients in disease remission in the avacopan group (72.3%) was non-inferior to the prednisone group (70.1%) according to the Applicant's testing plan. However, superiority was not met. *In pre-submission communications, FDA stated that a non-inferiority comparison would not be sufficient to show that avacopan can replace glucocorticoids as it would be difficult to establish whether avacopan is effective or whether rituximab/cyclophosphamide was the primary driver of the efficacy in both treatment arms. In addition, the Agency expressed concerns about the ability to adequately justify an acceptable non-inferiority margin, given that there were no historical trials appropriate to estimate the contribution of glucocorticoids to the treatment effect of glucocorticoids and cyclophosphamide or rituximab in the control arm*. As discussed below, the

-28-

justification for the non-inferiority (NI) margin was based on studies of different types of vasculitides, with different concomitant therapies, and of various designs that would not be considered appropriate to inform a NI margin for the study.

(2) Interpretation of the non-inferiority at Week 26 is further limited by the large number of patients in the avacopan arm (86%) who received non-study supplied glucocorticoids from Week 0 to 26. While the mean cumulative glucocorticoid dose per patient over Week 0 to 26 was lower (1072.9 mg) in the avacopan-treated patients compared to the mean cumulative dose in the prednisone-treated patients (3192.5 mg), the non-inferiority assessment is not a comparison of avacopan vs. prednisone, but instead avacopan plus lower dose glucocorticoids vs. higher dose glucocorticoids. At this time, it is not clear how much reduction in glucocorticoids would be considered clinically meaningful and if the protocol-specified higher dose of glucocorticoids is required for control of disease activity. Therefore, the interpretability and meaningfulness of this comparison is challenging. …

(3) The clinical pharmacology program has identified avacopan as a CYP3A4 inhibitor that has the potential to increase exposures to systemic glucocorticoids which are CYP3A4 substrates, raising further uncertainties about the true difference in glucocorticoid exposures and its impact on the non-inferiority comparisons between the two groups at Week 26, and respectively the proposed role of avacopan as a steroid-sparing agent, as glucocorticoid exposures were not assessed in Study CL010_168.

(4) At Week 52, there was a disparity in observed treatment effects between the subgroups that received rituximab and cyclophosphamide (IV and oral) induction treatment. The estimated risk difference for disease remission at Week 52 was 15.0% (95% CI: [2.2%, 27.7%]) in the subgroup receiving induction with rituximab and 3.3% (95% CI: [-14.8%, 21.4%]) in the cyclophosphamide plus maintenance azathioprine subgroup (Table 10). **Based on the data, there is no evidence of clinically meaningful treatment effect in the cyclophosphamide induction subgroup**. Further, the treatment comparison in the complementary rituximab induction subgroup may not be considered meaningful because these patients did not receive maintenance therapy, i.e., due to undertreating of patients, **the effect observed in the rituximab subgroup may not represent a clinically meaningful treatment effect compared to standard of care. Thus, the observed superiority at Week 52 may be a result of the treatment difference in the subgroup receiving induction with rituximab**. We note that, at the time the study was designed, repeat dosing with rituximab was not established as maintenance therapy; however, long-term immunosuppression had been demonstrated to reduce disease relapse and was standard-of-care. The result of the subgroup analysis suggests the possibility that avacopan was efficacious only in the population who did not receive standard-of-care maintenance immunosuppression therapy and may be

considered undertreated, raising questions about the adequacy of the comparisons and clinical meaningfulness of the avacopan effect at Week 52.

(5) There were differences between the assessments performed by the Investigator and the Adjudication Committee, most frequently related to the attribution of persistent vasculitis which was not captured in the modified BVAS administered in the study. Discrepancies between the Investigator and Adjudication Committee occurred in 17 patients at Week 52. Statistical analyses of the primary endpoint using the Investigator assessment of BVAS remission resulted in more conservative estimates of treatment effect, e.g., statistical significance for superiority would no longer be demonstrated with these scores. While the pre-specified analysis used the Adjudicator assessments, the assessment based on the Investigators, experienced in management of vasculitis, may better reflect real-world use.

83.     The FDA raised serious concerns about the safety of avacopan.  Specifically:

Deaths were rare, 2 in the avacopan arm and 4 in the control arm. Treatment-emergent infections, serious infections, and opportunistic infections were similar or fewer in the avacopan group. … One avacopan-treated patient had life-threatening hepatitis B reactivation during the follow-up period after rituximab treatment. A greater proportion of avacopan-treated patients had [adverse events] associated with hepatic abnormalities … including hepatobiliary disorders. … The proportion of patients with [adverse events] and [severe adverse events] within the hepatobiliary system organ class were also greater in the avacopan group … as compared to the prednisone group. … One patient had [a severe adverse event] of hepatocellular injury with increase in liver enzymes upon rechallenge with avacopan. One patient had an SAE of hepatic function abnormal with improvement in liver enzymes after discontinuation of avacopan; this patient was also found to have a positive hepatitis B DNA assay with entecavir and did not resume avacopan. The Investigator assessed the event as possibly related to avacopan, but attribution of the event is confounded by the subsequent diagnosis of hepatitis B. One patient had an [severe adverse event] of severe hepatic function abnormal and met Hy's Law laboratory criteria with a liver biopsy that was suggestive of drug-induced hepatitis; however, this patient also received multiple other drugs associated with liver enzyme elevations. [Adverse events] associated with hepatic abnormalities led to drug discontinuation in 7 patients in the avacopan arm and 2 patients in the prednisone arm. In addition, there were 2 patients with angioedema (1 serious) in the avacopan group, compared to none in the prednisone group. ***Given the small safety database, conclusions are limited, however, imbalances in hepatotoxicity, liver enzyme elevations, and angioedema are observed despite the small sample size.***

84.     In a section of the Briefing Document titled "Benefit-Risk Considerations," the FDA stated, "AAV is a rare and serious disease associated with high morbidity and mortality.  It is also a disease with high unmet need for new therapies.  Given these considerations, in principle, a single adequate and well-controlled (AWC) study may be considered to establish substantial evidence of efficacy.  However, in [ADVOCATE] *there are substantial uncertainties around the phase 3 study design and results, raising questions about the adequacy of this single trial to inform the benefit-risk assessment*."

85.     Among other concerns the FDA raised in this section, it stated, "the Applicant has not provided adequate data or information that would isolate the effect of prednisone to inform the margin of the non-inferiority comparison in this study," "the interpretation of the non-inferiority assessment is challenging," and "data from the clinical pharmacology program has identified avacopan as a CYP3A4 inhibitor that has the potential to increase exposures to systemic glucocorticoids which are CYP3A4 substrates, raising further questions about the true difference in glucocorticoid exposures and its impact on the non-inferiority comparisons between the two groups, and respectively the proposed role of avacopan as a steroid-sparing agent."  The FDA further noted that although "statistical significance was observed for both non-inferiority and superiority at Week 52 for the primary endpoint, it is not clear if the comparisons between and prednisone arm beyond Week 26 are meaningful.  Superiority of the avacopan arm over the prednisone arm was not achieved for remission at Week 26."

86.     The FDA revelations shocked analysts.  For example, Piper Sandler commented that the Briefing Document raised "serious questions" about the Phase 3 ADVOCATE trial design and the analysis of avacopan's effect in treating ANCA-associated vasculitis.  JPMorgan called the Briefing Document "worse than expected," and stated that the "negative tone/stance of the FDA documents is without a doubt concerning."  Similarly, SVBLeerink stated, the "FDA briefing documents are surprisingly critical."

Class Action Complaint for Violation of the Federal Securities Laws

87.     As a result of this news, ChemoCentryx's common stock price per share dropped from $48.82 per share at the close of trading on May 3, 2021, to $26.63 per share at the close of trading on May 4, 2021, and the Class was damaged thereby.

88.     On May 6, 2021, after the close of trading, ChemoCentryx issued a press release announcing the results of the Advisory Committee meeting.   The 18-member Advisory Committee voted on three issues.   First, the Advisory Committee was evenly divided, 9-9, as to whether the efficacy data from ADVOCATE supported approval of avacopan.   Second, on the question of whether the benefit-risk profile of avacopan was adequate to support approval, the Advisory Committee voted 10-8 in that the benefit-risk profile did support approval.   However one of the Advisory Committee members later said that they misunderstood the question and would have voted no had they understood the question at the time, so effectively the vote was 9-9.   Third, the Advisory Committee narrowly voted 10-8 that the safety profile of avacopan was adequate to support approval.

89.     Further, an *Endpoints News* article published on May 6, 2021 reported that "[t]hose voting against approval raised concerns about relying on the single trial as evidence, the insufficient amount of safety data, and questions on whether the trial was statistically robust enough.   Some panelists called for ChemoCentryx to run another trial."

90.     Investment analysts widely perceived this news as a sign that the FDA would not approve avacopan.   For example, Piper Sandler analysts stated, "we do not believe the [Advisory Committee] vote will be sufficient to persuade the FDA to approve avacopan."   Similarly, Wells Fargo analysts stated, "we do not expect the [Advisory Committee] outcome to sway FDA's opinion … we see [the FDA] requiring a second phase 3 study … as the most likely" outcome.

91.     As a result of this news, ChemoCentryx's common stock price per share dropped from $27.49 per share at the close of trading on May 6, 2021 to $10.46 per share at the close of trading on May 7, 2021, and the Class was damaged thereby.

**LOSS CAUSATION**

92.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market.  This artificially inflated the price of ChemoCentryx common stock and operated as a fraud or deceit on the Class.  Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market on May 4, 2021 and May 6, 2021, as alleged herein, the price of ChemoCentryx common stock fell precipitously, as the prior artificial inflation came out of the price.  As a result of their purchases of ChemoCentryx common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

**CLASS ACTION ALLEGATIONS**

93.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired ChemoCentryx common stock during the Class Period (the "Class").  Excluded from the Class are Defendants and their families, directors, and officers of ChemoCentryx and their families and affiliates.

94.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of April 23, 2021, there were more than 69.7 million shares of ChemoCentryx stock outstanding, owned by at least thousands of investors.

95.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

    A.  Whether Defendants violated the Exchange Act;

    B.  Whether Defendants omitted and/or misrepresented material facts;

Class Action Complaint for Violation of the Federal Securities Laws

C.  Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

D.  Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

E.  Whether the price of ChemoCentryx's common stock was artificially inflated;

F.  Whether Defendants' conduct caused the members of the Class to sustain damages; and

G.  The extent of damage sustained by Class members and the appropriate measure of damages.

96.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

97.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

98.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**INAPPLICABILITY OF STATUTORY SAFE HARBOR**

99.     ChemoCentryx's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective and inapplicable and cannot shield the statements at issue from liability.

100.     Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was made by or authorized and/or approved by an executive officer of ChemoCentryx who knew that the statement was false.

## PRESUMPTION OF RELIANCE

101.    At all relevant times, the market for ChemoCentryx's common stock was an efficient market for the following reasons, among others:

    A.  ChemoCentryx stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

    B.  As a regulated issuer, ChemoCentryx filed periodic public reports with the SEC;

    C.  ChemoCentryx regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

    D.  ChemoCentryx was followed by many securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

102.    As a result of the foregoing, the market for ChemoCentryx common stock promptly digested current information regarding ChemoCentryx from all publicly available sources and reflected such information in the price.  Under these circumstances, all purchasers of ChemoCentryx's common stock during the Class Period suffered similar injury through their purchase of ChemoCentryx common stock at artificially inflated prices and the presumption of reliance applies.

103.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.

## COUNT I

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants**

104.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

105.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase ChemoCentryx common stock at artificially inflated prices.

106.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for ChemoCentryx common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

107.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the design and results of the ADVOCATE trial, and the efficacy and safety profile of avacopan.

108.    During the Class Period, Defendants made the false statements specified above which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

109.    Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal the truth about the design and results of the

ADVOCATE trial, and the efficacy and safety profile of avacopan from the investing public and to support the artificially inflated prices of the Company's common stock.

110.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for ChemoCentryx's common stock.  Plaintiff and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices had been artificially inflated by Defendants' fraudulent course of conduct.

111.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

112.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

**For Violation of Section 20(a) of the Exchange Act Against Thomas J. Schall**

113.    Plaintiff repeats, incorporates, and re-alleges each and every allegation set forth above as if fully set forth herein.

114.    Defendant Schall acted as a controlling person of ChemoCentryx within the meaning of Section 20(a) of the Exchange Act.  By virtue of his high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to day operations of the Company, and/or intimate knowledge of the Company's actual performance, and his power to control public statements about ChemoCentryx, Defendant Schall had the power and ability to control the actions of ChemoCentryx and its employees.  By reason of such conduct, Defendant Schall is liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

115.    **WHEREFORE**, Plaintiff prays for judgment as follows:

Class Action Complaint for Violation of the Federal Securities Laws

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D. Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## JURY DEMAND

116. Plaintiff demands a jury trial.

Dated: June 8, 2021                                    Respectfully submitted,

                                                       **BLEICHMAR FONTI & AULD LLP**

                                                       /s/ *Peter E. Borkon*
                                                       Peter E. Borkon (Bar No. 212596)
                                                       555 12th Street, Suite 1600
                                                       Oakland, CA 94607
                                                       Telephone: (415) 445-4003
                                                       Facsimile: (415) 445-4020
                                                       pborkon@bfalaw.com

                                                       Javier Bleichmar (*pro hac vice* to be filed)
                                                       7 Times Square, 27th Floor
                                                       New York, New York 10036
                                                       Telephone: (212) 789-1340
                                                       Facsimile: (212) 205-3960
                                                       jbleichmar@bfalaw.com

                                                       *Counsel for Plaintiff Southeastern Pennsylvania Transportation Authority*

-38-

Class Action Complaint for Violation of the Federal Securities Laws

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**KEHOE LAW FIRM, P.C.**
John A. Kehoe (*pro hac vice* to be filed)
Two Penn Center Plaza
1500 JFK Boulevard, Suite 1020
Philadelphia, PA 19012
Telephone: (215) 792-6676
jkehoe@kehoelawfirm.com

*Of Counsel for Plaintiff Southeastern Pennsylvania Transportation Authority*

Class Action Complaint for Violation of the Federal Securities Laws